THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT BROOKS, Defendant-Appellant.

(No. 58177;

First District (4th Division)—May 22, 1974.

Paul Bradley and Edwin R. McCullough, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Dennis J. O'Hara, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The defendant, Robert Brooks, was indicted for murder. On April 28, 1972, after a bench trial, he was found guilty of involuntary manslaughter and sentenced to a term of 3 to 10 years in the penitentiary.

In this appeal he contends that (1) he did not knowingly and intelligently waive his constitutional right to a trial by jury, (2) the evidence was insufficient to prove him guilty of involuntary manslaughter beyond a reasonable doubt, and (3) the sentence he received is excessive and should be reduced.

The evidence discloses that the defendant shot and killed Leonis Steinys on the night of July 24, 1971. Defendant raised the justification of self-defense.

We first consider whether the record adequately shows a knowing and intelligent waiver of the basic constitutional right to a trial by jury. The transcript discloses that the defendant initially demanded a jury trial. On April 24, 1972, eight jurors had been selected. The following morning defense counsel informed the court out of the presence of the jurors that he felt the defendant could not receive a fair trial because the prosecutor had excused every black prospective juror in a proceeding where a black man was charged with killing a white man. He therefore moved to withdraw the defendant's request for a jury trial and to submit the case to the court. The prosecutor replied that defendant had the right to waive a jury and submit the issue of his guilt or innocence to the court, but he pointed out that he was merely exercising the State's right to excuse jurors according to law. The prosecutor further submitted that, in view of the charges which defense counsel directed at him, the cause be transferred to another courtroom to alleviate any ill feelings. Defense counsel stated he saw no reason to transfer the case because he felt that the defendant would have a fair and impartial trial before the court. The court therefore denied the assistant State's Attorney's motion to transfer the case. When the defendant was brought into the courtroom the following occurred.

"THE COURT: * * * I hold in my hand a document which is known as a waiver of a jury (indicating). Now I must inform you, Mr. Brooks, that you have a right to a jury trial as you are aware, in which your guilt or innocence will be decided by twelve people; and as a matter of fact, we were just engaged in selecting a jury to determine your guilt or innocence.

Now, I understand that you want to give up your right to a jury trial, is that right, you don't want a jury trial?

THE WITNESS: I want a jury.

MR. PAYNE (Defense counsel): I advised you to waive a jury.

THE COURT: You don't want a jury or you want a jury.

MR. PAYNE: I advised you to waive a jury, now you can do that if you want to.

THE WITNESS: I will waive the jury.

THE COURT: Now you know, of course, you have a right to a jury knowing you have a right to a jury you are still giving up your right, is that right, you are not exercising your right?

THE WITNESS: I didn't know what I signed. I can't read or write.

MR. PAYNE: He neither reads nor writes, your Honor.

THE COURT: I will tell you what you signed is a jury waiver, in which you are giving up your right to a jury.

THE WITNESS: I can't read that.

THE COURT: Now, do you want to give up your right to a jury, or not?

THE WITNESS: I want the jury.

THE COURT: You want the jury?

THE WITNESS: Yes, sir.

THE COURT: Mr. Payne, apparently you and your client are not together on this thing.

MR. PAYNE: No, we are not. I had advised him that I wanted to waive a jury. The determination is up to him, I wanted the case heard by the court and not by a jury. Do you understand?

Remember, your Honor, this man is illiterate.

THE WITNESS: I don't know.

MR. PAYNE: He doesn't read nor write, and that is the whole thing.

THE COURT: Well, let me ask you again, for the record: You want to be tried by me, or by a jury?

THE WITNESS: I want to be tried by you.

THE COURT: Very well. Let the record so indicate, Mr. Posey."

■■ The Illinois Code of Criminal Procedure, section 103—6 (Ill. Rev. Stat. 1971, ch. 38, par. 103—6), provides:

"Every person accused of an offense shall have the right to a trial by jury unless understandingly waived by defendant in open court."

Whether a jury waiver has been knowingly and understandingly made depends upon the facts and circumstances of each case, and there can be no precise formula for determining whether a waiver is understandingly made. (*People v. Richardson*, 32 Ill.2d 497, 499, 207 N.E.2d 453, 454.) Although a certain amount of inconsistency in defendant's responses may

appear in the record, this does not necessarily warrant a finding that defendant was coerced or did not make an understanding waiver. (Compare *People v. Benjamin*, 34 Ill.2d 183, 215 N.E.2d 216; *People v. Williams*, 110 Ill.App.2d 111, 249 N.E.2d 163.) Here admittedly after some vacillation, the defendant finally emphatically stated that he wanted to be tried by the court, as urgently advised by his privately retained counsel. We feel the record establishes an understanding waiver by defendant of his right to trial by jury.

The case of *People v. Bell*, 104 Ill.App.2d 479, 244 N.E.2d 321, relied on by defendant, has important distinguishing characteristics. There the appellate court found absolutely no indication that the defendant knew or was informed of the meaning and consequences of a jury waiver, even though he acknowledged that he did not want a jury. Here that is not the case. The judge explained to defendant Brooks the meaning and consequences of a jury trial, and in fact the jury waiver came after eight jurors had already been chosen for the trial. The only confusion appears in his decision whether or not to waive the jury, and his final decision, based on his counsel's recommendation, was affirmative.

It is next contended that the conviction of involuntary manslaughter be reversed because guilt was not established beyond a reasonable doubt. Defendant maintains that his action in firing his gun was justified as self-defense, and that the evidence supports the proposition that he had a reasonable belief that an imminent danger of great bodily harm existed and that force was necessary to avert that danger.

The record discloses that the defendant and the deceased had lived together since 1967 in a five-room basement apartment at 6101 South Drexel in Chicago, where the deceased was a janitor. The defendant testified that the deceased carried a gun on him every day and had a reputation for violence. This testimony was corroborated by other witnesses. The defendant further testified that at about 2 o'clock on the afternoon of July 24, 1971, the same day on which the shooting occurred, the deceased demanded that he pay all the light bill or move out. The defendant replied he would move, and asked the deceased for $200 which defendant had lent him. The deceased reached in his drawer, pulled out his gun, stuck it in defendant's face, and said, "I got $600 of this here for you." Charles Miller, who was working for the deceased at the time, testified that he witnessed the above occurrence, and he corroborated it in essential respects.

The defendant's version of the shooting, which occurred later that evening in the rear of an apartment building at 1031 East 61st Street in Chicago, was the following. He had gone to his brother's apartment at the above address and collected a gun, pants, and a jacket belonging to

him at about 10 P.M. As he came off the first-floor rear porch and started out the back yard, he heard the deceased call his name from the second floor stairway, where he was sitting with one Barbara Johnson. The deceased said "Come here," and the defendant responded "What do you want, man? I am in a hurry." The deceased came downstairs and said "Come on," and they both started out of the yard with the defendant following him at a distance of about 4 or 5 feet. Defendant then testified: "We was [sic] walking alone and all of a sudden the man stopped dead still and wheeled on me * * *. I swear 'fore God I just come out with my gun and started shooting." He further testified that he shot because he was scared, and that he did not know how many shots he fired. He was uncertain at trial as to whether the defendant had a gun at the time. None was found on or near the body by the police.

One of the State's witnesses, Alice Allen, a girl friend of the deceased, testified she was sitting on the back porch of her apartment. She heard the defendant, who was standing down in the yard, tell the deceased to come down off the porch because he wanted to talk to him. The deceased told him to come up and have a beer. After the defendant called him down a couple more times, the deceased walked down the steps. Then she heard a gun shot and saw the deceased run towards the alley. When she heard the shot the defendant was standing near the deceased. She heard additional shots and ran down the steps to the deceased's body, which was lying face down. There were no weapons in his possession.

Barbara Johnson, who was 15 years old, testified that she was sitting on her back porch when she heard the defendant call the deceased downstairs. After being called down the third time, the deceased went down. "That's when [she] heard the first shot." She saw the deceased run and then she heard more gunshots and the deceased fell. The defendant left the yard.

The police arrived shortly after the shooting. They found no weapon on or near the deceased. When they arrested the defendant at another location the defendant stated it was an accident because he shot into the ground. He assisted the police in recovering his gun, which contained five spent bullets in the chamber. A pathologist testified that the autopsy showed bullet entry wounds on the forearm and on the chest, and that the cause of death was the chest wound.

■■ The issue of self-defense is ordinarily a question of fact and need not be accepted as true by the trier of the facts. Indeed the court must also consider the circumstances surrounding the killing and the testimony of all the witnesses. (*People v. French*, 3 Ill.App.3d 884, 279 N.E.

2d 519.) When the evidence is conflicting it is the function of the trier of the facts to resolve the conflict and determine the credibility of the various witnesses. *People v. Speed*, 52 Ill.2d 141, 284 N.E.2d 636.

■■ The defendant in order to justify the shooting relies heavily upon the trial testimony that the deceased usually carried a gun and had a violent reputation and had previously threatened him. But there was also testimony here that the defendant called the deceased, who was on a porch, to come down to the yard while he was in possession of a firearm. Although the deceased told him to come up and have a beer he persisted in telling him to come down. When he did come down the defendant stated that the deceased made one quick move and he shot at him. The defendant continued to shoot at close range after the deceased was seen running. No weapon was found on the deceased. There was sufficient indication that the defendant's action was not legally justifiable as self-defense. Ill. Rev. Stat. 1971, ch. 38, par. 7—1.

In *People v. Taylor*, 3 Ill.App.3d 734, 279 N.E.2d 143, relied on by the defense, the defendant had been thrown to the floor by a half-drunk gun-wielding bartender. There the defendant fired three warning shots to get him off, and only when that failed did he shoot and kill his assailant. This case is clearly inapplicable on the facts.

Although the defendant was charged with murder, he was found guilty of involuntary manslaughter. Section 9—3(a) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 9—3(a)) provides:

> "A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

The record in this case presents ample proof of defendant's conscious disregard for the deceased's life and of his culpability for the crime of involuntary manslaughter.

■■ The final contention is that the 3-to-10 year sentence imposed is excessive in light of the "nature and circumstances of the offense and the history and character of the defendant." The sentence is clearly within the limits prescribed by the legislature (Ill. Rev. Stat. 1973, ch. 38, pars. 9—3(c)(1), 1005—8—1(b)(4), 1005—8—1(c)(4)), and we feel it is consistent with the concept of rehabilitation.

For the foregoing reasons the judgment is affirmed.

Judgment affirmed.

ADESKO, P. J., and DIERINGER, J., concur.